JOHN R. IRVINE, APPELLANT, *v.* WILLIAM R. MARSHALL AND THOMAS BARTON.

At a sale of public lands in a Territory, an agent who purchased for another must account, as trustee, to his employer, although the statutes of the Territory have abolished all resulting trusts.

The United States, being the owner of the public lands within the States and Territories, have the right to say to whom, in what mode, and by what title, they shall be conveyed.

It promotes the public sales, that agents should be allowed to attend and purchase, under the usual responsibility of agents or trustees.

The control, enjoyment, and disposal, by the United States, of their own property, is independent of the locality of such property, whether it be situated in a State or Territory; nor are the contracts of the Government with respect to subjects within its constitutional competency, local, or confined in their effects and operation strictly to the sites of the subjects to which they relate.

Although a certificate may be the subject of bargain and sale, yet the United States can take care that the conveyance shall be made to him who is in good faith their vendee.

The jurisdiction of the courts of the United States as courts of equity is ample to enforce the performance of trusts under both the Constitution and laws.

The United States can declare by Congress what the law shall be with respect to the public lands, and enforce that law through the judiciary department.

Although the officers of the land department may in practice, and as a rule of convenience, have received the certificate of purchase as evidence of title, yet neither that practice nor the certificate itself can control the power either of the United States or of this court, to adjudge or to confirm the title to the land to the true owner.

THIS was an appeal from the Supreme Court of the Territory of Minnesota.

The facts are stated in the opinion of the court.

It was argued by *Mr. Cooper* for the appellant, and by *Mr. Bradley* for the appellee, upon which side there was also filed a brief by *Mr. Brisbin* and *Mr. Stevens.*

Mr. Justice DANIEL delivered the opinion of the court.

The proceedings in this cause, though in form somewhat anomalous and peculiar, may be regarded as presenting substantially the case of a bill for the specific performance of a contract; a demurrer to the relief sought by that bill, a decree (or what in the proceedings is called a judgment) sustaining the demurrer, although there is no express or formal direction or order for a dismission of the bill; and a general affirmance, by what is styled the judgment of the Supreme Court of the Territory, of the decision of the District Court.

The appellant, in his complaint in the District Court of the Territory, alleges, that at a sale of public lands which occurred on the 11th day of September, in the year 1854, at the land office at Stillwater, in the Territory of Minnesota, in pursu-

ance of the proclamation of the President of the United States, the appellee, Marshall, as the agent, and with the funds and under the authority of the complainant, and of the appellee, Barton, purchased for them the southwest quarter of section number seven, in township number twenty-eight north, of range twenty-three west, in the county of Ramsey, containing one hundred and sixty acres, at the price of one dollar and twenty-five cents per acre, making an aggregate of two hundred dollars for the entire purchase; the certificate for which purchase was, with the assent of the complainant and Barton, issued in the name of their said agent, Marshall. That notwithstanding the equality of interest in the land in the complainant and Barton, and the fact that the price was furnished by them in equal portions, viz: one hundred dollars by each of these parties, the appellee, Barton, has claimed the entire tract of land; and the agent, Marshall, in consequence, or under the pretext of this pretension, refuses to convey to the complainant his rightful portion, viz: one full undivided moiety of these lands.

The bill next charges, that Marshall is about to convey the whole of the land to Barton, in fraud of the complainant's rights, and concludes with a prayer that Marshall may be enjoined from executing such a conveyance to Barton, and may be compelled to convey to the complainant his full undivided half part of the land, in conformity with the terms and objects of the purchase; it contains also a prayer for general relief. To this complaint there was no answer; but the record of the District Court discloses the following entries:

"Territory of Minnesota, county of Ramsey. District Court, second district. John R. Irvine against William R. Marshall and Thomas Barton. Then came the defendants, by their attorney, and demur to the complaint of the plaintiff herein, and specify the following grounds of demurrer:

"First. The complaint does not state on its face facts sufficient to constitute a cause of action.

"Second. The complaint alleges that the defendant, Marshall, purchased the land mentioned therein, *in trust* for the plaintiff and the defendant, Barton. No trust arises or can grow out of the facts stated.

"Third. Admitting that a trust could arise upon the facts, the complaint does not show the plaintiff entitled to the relief sought, inasmuch as it does not specify the nature of the trust.

"Fourth. There is a defect of the parties defendants; it does not appear that the defendant, Barton, has any interest in the event of the action. It does not appear that the defendant,

Barton, has any interest 'in the event of the suit, adverse to the plaintiff.' "

Next follows the decision, judgment, or decree, by whichsoever of these titles it may be appropriately designated, in these words: "There is no allegation in the complaint that the conveyance was taken without the knowledge or consent of the complainant, nor that the purchase was made in violation of some trust. The complainant does not therefore bring himself within the provisions of sec. 9, p. 202, of the revised statutes, and the demurrer must be sustained. See also sec. 5, of the same chapter. I do not discover any defect of parties. The plaintiff has twenty days to amend, so as to bring his complaint within the provisions of sec. 9 referred to, if he shall be advised that the facts will warrant it."

There having been no amendment of the pleadings in the District Court, either proposed or allowed, the decision of that court must be regarded as final between the parties upon the case, as disclosed on the face of the record; and that decision having been taken by appeal to the Supreme Court of the Territory, the following transcript is certified as, containing the proceedings of the latter tribunal in this cause:

"July 15, 1856. John R. Irvine, appellant, *v.* Marshall and Barton, respondents. This cause having been argued and submitted, after due consideration of the matters at issue herein, it appears to the court that in the order and judgment thereon in the court below, there is no error. It is therefore ordered that said judgment be in all things affirmed, with costs to respondents."

The omission in this latter decision of any statement of the particular grounds on which it has been placed, and the general reference made by it to the opinion of the District Court, not showing the principles and the authority on which the judgment of affirmance has been rested, lead necessarily to an examination of the opinion of the District Court as the true test of conclusions, adopting that opinion and relying upon it for their support. In such an examination, it would be unnecessary, and even irregular, to consider any points not ruled by the inferior court; as whatever has not been adjudged or passed upon by an inferior tribunal, cannot be embraced in a general judgment, either of affirmance or reversal, upon an appeal from its opinion.

The points intended to be ruled by the District Court, and affirmed by the Supreme Court of Minnesota, if sought for solely upon the face of the judgments of those courts, or even with the aid of the references to the Territorial statute furnished by the former judgment, it might be difficult to dis-

cover. Connecting those references, however, with the seventh and eighth sections of the statutes of Minnesota, (Rev. Stat., pp. 202, 203,) we may perceive in the decisions of these Territorial courts the design to assert and establish the following positions, viz: That in every instance of a grant or purchase, or of an agreement for the purchase of lands for a valuable consideration, in which the price or consideration shall be paid by one person, and the conveyance or the contract for title shall be to another, no use or trust shall result in favor of the person by whom such payment shall be made, but the title and possession shall vest exclusively in the person named as the alienee in such conveyance or agreement.  The position asserted by the court of Minnesota, in interpreting their statute, must be understood as broadly as it has just been stated, or it has no application to the case before us.    It is a denunciation of everything like an equitable title or lien, or a resulting trust, with the exceptions contained in the eighth and ninth sections of the statute, of the interests of creditors of the equitable claimant, of instances in which the alienee or agent shall, without the knowledge and consent of him who paid the consideration, have taken the conveyance in his own name; or shall, in violation of some trust, have purchased the lands with moneys belonging to another person.

The authority and effect of the Territorial laws of Minnesota upon subjects within the legitimate bounds or cognizance of that Territorial Government, no person, it is presumed, will be disposed to question; but it seems equally clear that to respect the rights and interests which come not within the scope of that authority, but which are created by the Constitution and laws of the United States, imposes a duty as sacred as any which enjoins upon a State or Territory the obligation to protect and maintain whatever of power may justly belong to it.    And it cannot without extravagance be supposed, that to secure these proper and necessary ends, the Territory should assume the power to control the acquisition or transmission of property never belonging to, and not acquired from, herself; to which, therefore, she could annex no conditions, much less conditions which might impair the interests of the citizens of every State, and of every State collectively in the Confederacy, and even of the United States, and render utterly worthless, and incapable of being disposed of, subjects in which the Territory has no legal right or property whatsoever.   It cannot be denied that all the lands in the Territories, not appropriated by competent authority before they were acquired, are in the first instance the exclusive property of the United States, to be disposed of to such persons, at such times, and in such modes,

and by such titles, as the Government may deem most advantageous to the public fisc, or in other respects most politic. This right has been uniformly reserved by solemn compacts upon the admission of new States, and has heretofore been recognised and scrupulously respected by sovereign States within which large portions of the public lands have been comprised, and within which much of those lands is still remaining. Can this right co-exist with a power in a Territory (itself the property of the United States) to interpose and to dictate to the United States to whom, and in what mode, and by what title, the public lands shall be conveyed? If a person desirous of purchasing shall depute an agent to attend a sale of public lands, and if at such sale payment be made by the agent with the funds of his principal, and both agent and principal shall present themselves at the General Land Office, and mutually request a patent to be issued to the true owner, can it possibly be thought within the competency of a Territorial Legislature, either upon the suggestion, or upon proof of the fact, that a certificate of purchase was given to the agent in his own name, to interpose, and say to the Federal Government, *you shall not make a title to this person whom you know, upon the acknowledgment of all concerned, is the true and bona fide purchaser of the land, and if you do we will vacate that title?* Is it not for the increase of the revenue that the sales of the public lands should be as extensive as possible, and is it not obviously promotive of this end, that persons who can attend and bid at those sales by agent or attorney only, as well as those who can attend them in person, should have the power to purchase; and would not an inhibition of this privilege operate to restrict the sales of the public lands, and thereby injure the revenue of the Government? And *cui bono*, should this mischief be permitted? Simply to favor a visionary innovation for the destruction of resulting trusts and equitable titles, a class of titles resting upon the essential elements of all honest titles, *truth* and *justice*, and coeval with the very rudiments of equity law. And this innovation, too, to be extended not merely to cases which from contestation or from defective proof might be uncertain or hazardous, but to instances which shall forbid to persons willing and proffering the fulfilment of their duty, the power to do so. The power of being honest, a power surely not so often exerted as to merit being repulsed as obtrusive and ungracious.

1st. It has been argued that the subject of this controversy is situated within the limits of the Territory.

2d. That it is *property*, and may pass as such by devise or inheritance.

3d. That in some of the States and Territories, actions at law may be maintained on these certificates.

4th. It is asked under what head of jurisdiction, in the absence of express and particular statutory provision, the courts of the United States can recognise or enforce a resulting trust like that in the present case. The fallacy of the conclusion attempted from the first of the positions just stated, consists in the supposition, that the control of the United States over property admitted to be their own, is dependent upon locality, as to the point within the limits of a State or Territory within which that property may be situated. But as the control, enjoyment, or disposal of that property, must be exclusively in the United States, anywhere and everywhere within their own limits, and within the powers delegated by the Constitution, no State, and much less can a Territory, (yet remaining under the authority of the Federal Government,) interfere with the regular, the just, and necessary powers of the latter. Another error, inherent in the same position, is seen in the supposition that the contracts of the Government with respect to subjects within its constitutional competency are also local, confined in their effect and operation strictly to the *situs* of the subjects to which they relate. The true principle applicable to the objection just noted, and by which that objection is at once obviated, we hold to be this: That within the provisions prescribed by the Constitution, and by the laws enacted in accordance with the Constitution, the acts and powers of the Government are to be interpreted and applied so as to create and maintain a *system*, general, equal, and beneficial as a whole. By this rule, the acts and the contracts of the Government must be understood as referring to and sustaining the rights and interests of all the members of this Confederacy, and as neither emanating from, nor intended for the promotion of, any policy peculiarly local, nor in any respect dependent upon such policy. The system adopted for the disposition of the public lands embraces the interests of all the States, and proposes the equal participation therein of all the people of all the States. This system is therefore peculiarly and exclusively the exercise of a Federal power. The theatre of its accomplishment is the seat of the Federal Government. The mode of that accomplishment, the evidences or muniments of right it bestows, are all the work of Federal functionaries alone. Are these things in any degree compatible with the claim to prescribe to the United States the modes or the extent in which they may dispose of their own property, or with a denunciation of a forfeiture as the consequence of a departure from such a pretension?

With regard to the positions, that the right acquired by a purchase of a certificate, *bona fide* made, is property in the vendee, even before the emanation of the patent, and that some of the States have permitted suits at law to be instituted on certificates of purchase, (as several have permitted such suits on other equitable titles,) it is not perceived that the concession of either or both of these positions can in any degree impair the right of the United States to contract upon their own terms for the sale of their own property, or diminish their obligation in the fulfilment of their contract in good faith, to convey to their vendee the subject for which he has paid them. There certainly can exist nowhere a power to compel them to convey to any person, and much less to require of them the perpetration of a fraud in behalf of one in whom no shadow of a valid title is shown; and who, by the pleadings in this cause it is admitted, has acted dishonestly; whose admitted dishonesty indeed is the alleged and the sole foundation of the claim of the defendants.

When the engagements or undertaking of the United States, with respect to property exclusively and confessedly their own, from a period anterior to the existence of the Territorial Government, shall have been consummated; when the subject, and all control over it, shall have passed from the United States, and have become vested in a citizen or resident of the Territory, then indeed the Territorial regulations may operate upon it; but whilst these remain in the United States, or are affected by their rights, or powers, or duties, those rights, duties, or powers, can in no wise be influenced by an inferior and subordinate authority.

With regard to the fourth objection, of a want of jurisdiction in the courts of the United States, in the absence of express statutory provisions, to recognise and enforce a resulting trust like that presented by the present case, it is a sufficient response to say, that the jurisdiction of the courts of the United States is properly commensurate with every right and duty created, declared, or necessarily implied, by and under the Constitution and laws of the United States. Those courts are created courts of common law and equity; and under whichsoever of these classes of jurisprudence such rights or duties may fall, or be appropriately ranged, they are to be taken cognizance of and adjudicated according to the settled and known principles of that division to which they belong.

By the language of the Constitution it is expressly declared, (art. 3d, sec. 2, clause 1,) that the judicial power of the United States shall extend to all cases in law and equity arising under the Constitution, the laws of the United States, and treaties

made under their authority. By the statute which organized the judiciary of the United States, it is provided, that the Circuit Courts shall have jurisdiction of suits of a civil nature "at common law or in equity." (Vide 1 Stat. at L., p. 78, section 11.) In the interpretation of these clauses of the Constitution and the statute, this court has repeatedly ruled, that by cases at common law are to be understood suits in which legal rights are to be ascertained and determined, in contradistinction to those where equitable rights alone are recognised, and equitable remedies are administered. (Vide Parsons *v.* Bedford, 3 Pet., 447, and Robinson *v.* Campbell, 3 Wheaton, 212.) That by cases in equity are to be understood suits in which relief is sought according to the principles and practice of the equity jurisdiction, as established in English jurisprudence. (Vide the case of Robinson *v.* Campbell, just cited, and the United States *v.* Howland, 4 Wheaton, 108.) Here, then, is an exposition both of the Constitution and laws of the United States, with reference both to the jurisdiction and powers of their courts, and to the instances in which it is their duty to exercise those powers; and the inquiry forces itself upon us, who shall or can have the authority to deprive them of those powers and that jurisdiction? or can those courts, consistently with their duty, refuse to exert those powers and that jurisdiction for the protection of rights arising under the Constitution and laws, in the acceptation in which both have been interpreted and sanctioned?

With respect to resulting trusts, and the jurisdiction and duty of the courts of the United States to enforce them, the opinion of this court has been emphatically declared; and so declared in a case of peculiar force and appositeness, because it related to the acts of an agent in the entry and survey of lands, and is in its principal features essentially the same with the cause now under consideration. We allude to the case of Massie *v.* Watts, reported in the 6th vol. of Cranch, p. 143. This was a suit in equity in the Circuit Court of the United States for the district of Kentucky, to compel the conveyance of land from an agent to his principal, upon the ground that the agent had withdrawn an entry on lands made in the name of his principal, had caused an entry and survey to be made in his own name, and had thereby obtained a legal title to this land. In decreeing the relief sought by the complainant, this court, expounding the law by the Chief Justice, (pp. 169, 170,) said: "If Massie (*i. e.*, the agent) really believed that the entry of O'Neal, (his principal,) as made, could not be surveyed, it was his duty to amend it, or to place it elsewhere. But if in this he was mistaken, it would be dangerous in the extreme—

it would be a cover for fraud which could seldom be removed, if a locator alleging difficulties respecting a location might withdraw it, and take the land for himself. But Massie, the agent of O'Neal, has entered the land for himself, and obtained a patent in his own name. According to *the clearest and best-established principles of equity,* the agent who so acts becomes a *trustee* for his principal. He cannot hold the land under an entry for himself, otherwise *than as a trustee for his principal."* This exposition of the equity powers of the courts of the United States as applicable to resulting trusts—a power inseparable from the cognizance over frauds, one great province of equity jurisprudence—is conclusive.

With respect to the power of the Federal Government to assert, through the instrumentality of its appropriate organs, the administration of its constitutional rights and duties, and with regard to such an assertion as exemplified in the management and disposition of the public lands, and the titles thereto, the interpretation of this court has been settled too conclusively to admit of controversy.

In the case of Wilcox *v.* Jackson, reported in the 13th of Pet., p. 498, which presents an instance of an attempt to control, by the authority of the laws of the State of Illinois, the effect and operation of a right or title derivable from the United States to a portion of the public lands, this court thus emphatically declare the law: "It has been said that the State of Illinois has a right to declare, by law, that a title derived from the United States, which by their laws is only inchoate and imperfect, shall be deemed as perfect a title as if a patent had issued from the United States; and the construction of her own courts seems to give that effect to her statute. That State has an undoubted right to legislate as she may please in regard to the remedies to be prosecuted in her courts, and to regulate the disposition of the property of her citizens, by descent, devise, or alienation. But the property in question was a part of the public domain of the United States. Congress is invested by the Constitution with the power of disposing of and making needful rules and regulations respecting it. Congress has declared, as we have said, by its legislation, that in such a case as this, a patent is necessary to complete the title. But in this case no patent has issued; and therefore, by the laws of the United States, the legal title has not passed, but remains in the United States. Now, if it were competent for a State Legislature to say, that notwithstanding this, the title shall be deemed to have passed, the effect would be, not that Congress had the power of disposing of the public lands, and prescribing the rules and regulations concerning that disposition, but that

Illinois possessed it.   That would be to make the laws of Illinois paramount to those of Congress in relation to a subject confided by the Constitution to Congress only; and the practical result in this very case would be, by force of State legislation, to take from the United States their own lands, against their own will and against their own laws.   We hold the true principle to be this: that whenever the question in any court, State or Federal, is whether a title to land which was once the property of the United States has passed, that question must be resolved by the laws of the United States; but that whenever, according to those laws, the title shall have passed, then the property, like all other property in the State, is subject to State legislation, so far as that legislation is consistent with the admission, that the title passed and vested according to the laws of the United States."

It has been argued, that it is the practice of the officers of the land office to receive the certificate of purchase, as presenting upon its face the only evidence of title, and that those officers will recognise no other evidence of title but this certificate. Of the practice or the opinion of the officers of the land department, no evidence is exhibited upon this record.   But supposing these to be in accordance with the above suggestion, they could by no means control the action or the opinion of this court in expounding the law with reference to the rights of parties litigant before them; and this they must do, in accordance with their own convictions, uninfluenced by the opinions of any and every other department of the Government.   The reception of the certificate of purchase as evidence of title may be regular and convenient as a rule of business, but it has not been anywhere established as conclusive evidence, much less has it been adjudged to forbid or exclude proofs of the real and just rights of claimants.   It is mere justice to the officers of the land department, to presume that they would respect the interpretation of the Constitution and laws promulged by those who are appointed to be their expositors; but upon a supposition, or even upon a conviction of the converse of this, the path of duty here is plain and direct, and must be followed without hesitancy or deviation.   The judgment of the Supreme Court of Minnesota is reversed with costs, and this cause is remanded to that court, with instructions that it be remitted to the District Court, with permission to the defendant to answer over to the complaint of the plaintiff; and in the event of a refusal or failure of the defendant so to do, with direction to the District Court to render a judgment in favor of the plaintiff, in conformity with the law, as ruled by this court in this cause.

Mr. Justice CATRON, Mr. Justice GRIER, and Mr. Justice CAMPBELL, dissented, and concurred with Mr. Justice NELSON in the following dissenting opinion:

Mr. Justice NELSON:

In this case, Marshall bought at the request of Irvine and Barton a quarter section of land, at a land sale in Minnesota Territory, for which two hundred dollars was paid, and a patent certificate given to him in his name. One hundred dollars of the money was furnished by Irvine, and one hundred by Barton, and the land according to the arrangement was to be held in trust by Marshall, for their benefit. Barton, for some reason not explained, afterwards claimed the whole instead of an undivided half of the section, and demanded a conveyance of the same from Marshall, the trustee. Irvine afterwards applied to the trustee for a conveyance of his undivided half, which was refused, in consequence of the previous claim of Barton to the whole section. This suit is brought by Irvine, against Marshall, the trustee, to compel him to make the above conveyance.

The court below, on a demurrer to the complaint which contained the facts substantially as above stated, gave judgment for the defendant, refusing to compel the execution of the conveyance.

The question presented would be a very plain one at common or equity law upon the doctrine of trusts as administered by courts unaffected with any local legislation. The facts would present the case of a resulting trust for the benefit of the persons who had furnished the purchase-money, and the trustee compelled to convey accordingly the interest belonging to the respective parties.

But the Legislature of Minnesota have passed a law modifying the doctrine of uses and trusts, and especially in respect to resulting trusts of the character in question. It has provided, that when a grant is made for a valuable consideration to one person, and the consideration paid by another, no trust shall result in favor of the person paying the consideration, but the title shall vest in the person named as grantee, subject only to two exceptions: 1. In favor of the creditors of the person paying the consideration money; and 2. When the person taking the conveyance in his own name shall have taken it without the knowledge or consent of the party paying the consideration, or when the trustee shall have purchased, in violation of his trust, with moneys belonging to another person. (R. S. of Minnesota, pp. 202, 203, secs. 7, 8, 9.)

It is admitted that the present case does not fall within either

of the exceptions, and on this ground the relief in the court below was denied.

This provision in the laws of Minnesota will be found adopted in several of the States. This precise modification of a resulting trust was incorporated into the laws of the State of New York as early as 1830, and from which, as is said, it was taken and engrafted in the statutes of this Territory.

The object of the change is to prevent secret and fraudulent conveyances of property, with the view of defrauding creditors. A common and successful contrivance for this purpose, is by placing the title of the property in the name of a third person, while the whole of the beneficial interest is in another, thereby concealing it from the creditor, and embarrassing his remedy against the property of the debtor.

The provision is designed to deter parties from engaging in this contrivance, by subjecting the property, thus concealed in the name of another, to the peril of being claimed and held by him as his own. The question is one of State policy, in regulating the terms and conditions of holding and disposing of the property within the State, so as to encourage open and frank dealing with the same, and to prevent concealed and covenous trusts as a cover for defrauding creditors. It may be wise or unwise; that we suppose is a question with which courts have nothing to do, as the power of a State to regulate the subject is unquestionable, and in this respect the power in the Territory is the same.

It is insisted, however, that the nature or character of the property in question, impressed upon it by the law of Congress providing for and regulating the sales of the public lands, takes it out of the system of municipal law which, it must be admitted, governs and controls parties in dealing with property in general in the States and Territories. If this be so, it constitutes certainly a very important exception; for it is, perhaps, not hazarding too much in saying that in the new States, and in the Territories for many years after their organization, the largest portion of the real property owned and cultivated by the inhabitants is held and enjoyed under a title similar to that in question, namely, a patent certificate. And we may, I think, in respect to property in this predicament, ask, under what system of laws is it to be held and regulated, if the municipal laws of the State are to be set aside? It is true, the laws of Congress provide for and regulate the sale of the public lands, and, in doing so, provide for this inchoate title to be given to the purchaser, on paying the purchase-money. And, if any one undertakes to question this title, the law of Congress is called in as the highest evidence of it. Thus far the law of

Congress operates, of whatever nature or character that may be. But beyond this, whether A or B owns this inchoate title, whether A has made a good sale and transfer of it to another, or such a one as the municipal law will give effect to, are questions which do not concern the law of Congress or the Federal authorities. They are questions arising purely under the municipal laws. Whether the original purchaser who has received the certificate has himself settled on the section under it, or whether he has transferred it to another settler, are questions in which the Federal Government has no interest. They belong to the State within which the lands are situate. Indeed, the land department so determined at an early day, and in case of a dispute as to the ownership of the certificate, it gives the patent to the person named in it, leaving the parties to settle their disputes in the courts of law. The question in this case is not whether a title has been derived from the Federal Government under the act of Congress—that title is admitted, indeed it is that which gives value to the right in dispute—the question is, who has acquired the right to the property, after the title has been acquired from the Government; in other words, who owns this inchoate title secured by the patent certificate? That is a question depending upon local law. The point was well put by Judge Barbour, in delivering the opinion of the court in Wilcox v. Jackson, (13 Pet., 517.) "We hold," he observed, "the true principle to be this: that whenever the question in any court, State or Federal, is, whether the title to land which had been once the property of the United States has passed, that question must be resolved by the laws of the United States; but that, whenever according to those laws the title shall have passed, then that property, like all other property in the State, is subject to State legislation, so far as that legislation is consistent with the admission that the title passed according to the laws of the United States."

Now, it is upon this principle that the lands held under the patent certificate have become property in the State, and subject to its legislation, that they are subject to judgment and execution against the owner; to conveyance by deed or devise; to descend to his heirs at law on his decease, or to sale by a court of probate to pay his debts. And it may well be asked, if the title is thus subject to the municipal laws concerning judgments and executions, deeds of conveyance, devises, of descent, and of administration in the probate court, how the title can be exempt from the law of trusts? The general principles of equity can no more be invoked in respect to them than in respect to either of the other matters referred to, when they have been the subject of regulation by the local law.

That law then becomes the rule of property to govern them, the same as it governs the inheritance, or any other lawful disposition made of it. We do not see the reason or propriety of setting aside the local law in respect to this class of property as to trusts, while it is admitted to regulate every other legal disposition made of it; and I must therefore, for the reasons given, dissent from the opinion of the majority of the court.