29 F.Supp.2d 1068 (1998)
THERMAL SCIENCE, INC., Plaintiff,
v.
U.S. NUCLEAR REGULATORY COMMISSION, Defendant.
No. 4:96-CV-2282 CAS.
United States District Court, E.D. Missouri, Eastern Division.
June 23, 1998.
*1069 Gordon L. Ankney, Michael J. Morris, Thompson Coburn, St. Louis, MO, Martin S. Himeles, Jr., Sheryl B. Goldstein, Zuckerman and Spaeder, Baltimore, MD, for Thermal Science, Inc., plaintiffs.
Charles E. Mullins, Office of the General Counsel, U.S. Nuclear Regulatory Commission, Washington, DC, for Nuclear Regulatory Commission, defendants.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
SHAW, District Judge.
This matter is before the Court on plaintiff Thermal Science, Inc.'s ("TSI") Renewed Motion for a Preliminary Injunction and defendant Nuclear Regulatory Commission's ("NRC") Motion to Dismiss. Both motions have been briefed and this Court has heard oral argument. TSI's complaint for preliminary and permanent injunction asserts two separate arguments. First, TSI argues that the issuance of the Notice of Violation and proposed Imposition of Civil Penalties ("NOV") is a second attempt to punish TSI for the same offense in violation of the Double Jeopardy Clause. Second, TSI argues that the proceedings initiated by the NOV exceed the statutory authority of the NRC, because the agency lacks authority to impose monetary penalties on a non-licensee such as TSI.
*1070 The NRC responds that it has not exceeded its statutory authority or violated the Double Jeopardy Clause. The NRC further argues that this entire matter is before the Court prematurely, because TSI failed to exhaust its administrative remedies before filing the instant law suit, and the civil penalty it is challenging is only proposed.
After due consideration of the pleadings and the transcript of oral argument, this Court concludes that TSI's statutory and regulatory claims are premature and cannot be pursued in advance of a final NRC decision on whether to impose a civil penalty. The NRC's motion to dismiss will therefore be granted.

FINDINGS OF FACT

A. The Parties.

1. The NRC is an independent governmental regulatory agency established by Congress to regulate the nuclear power industry in the United States and to protect public health and safety under its authorizing statutes, the Atomic Energy Act ("AEA") of 1954, as amended, 42 U.S.C. § 2201, et seq., and the Energy Reorganization Act of 1974, as amended, 42 U.S.C. § 5801 et seq.
2. TSI is a Missouri corporation that manufactures, sells, and sometimes installs a family of products known as "Thermo-Lag." Thermo-Lag is a fire-retardant material with various industrial applications, including: (i) the protection from fire of chemical and petrochemical installations, railroad tank cars, and natural gas storage containers; (ii) protection of missiles and rockets from the heat generated upon reentry into Earth's atmosphere; and (iii) the protection of electrical cables in nuclear power plants.

B. The Enforcement Framework Established By The Atomic Energy Act.

3. All commercial nuclear power plants in the United States must operate under a license issued by the NRC.
4. Section 234 of the AEA, 42 U.S.C. § 2282, as most recently amended, provides that the NRC may issue civil monetary penalties to "[a]ny person who (1) violates any licensing or certification provision of ... 42 U.S.C. section 2073, [et seq.] ... or any rule, regulation, or order issued thereunder ... not to exceed $100,000 for each such violation." 42 U.S.C. § 2282(a)(1).
5. Under § 11s of the AEA, 42 U.S.C. § 2014(s), the term "person" includes "(1) any individual, corporation, partnership, firm, association ...; and (2) any legal successor, representative, agent, or agency of the foregoing."
6. According to §§ 221-223 of the AEA, 42 U.S.C. §§ 2271-2273, the U.S. Department of Justice may prosecute specified violations of law as criminal violations. These sections do not, however, grant the NRC independent authority to issue any regulations to implement those statutes.
7. Section 161 of the AEA, 42 U.S.C. § 2201, grants the NRC authority to "prescribe such regulations or orders as it may deem necessary ... to govern any activity authorized pursuant to this Act ....," 42 U.S.C. § 2201(i)(3), and under subsection p to "make, promulgate, issue, rescind, and amend such rules and regulations as may be necessary to carry out the purposes of this Act." 42 U.S.C. § 2201(p).

C. The NRC's 1991 Rulemaking Proceeding.

8. Between 1990 and 1991, the NRC conducted a rulemaking proceeding in which it amended its regulations governing the issuance of orders and civil penalties to unlicensed persons whose actions have a significant impact on activities authorized by the AEA.
9. On August 15, 1991, the NRC issued (1) a final rule establishing new procedures for issuing orders and civil penalties to non-licensed persons under 10 C.F.R. § 2.205 and (2) a new regulation, 10 C.F.R. § 50.5, which prohibited "deliberate misconduct" by both licensed and unlicensed persons with regard to licensed activities. See 56 Fed.Reg. 40,664 (1991).
10. The "Wrongdoer" Rule, 10 C.F.R. § 50.5, applies to, "Any licensee, applicant for a license, employee of a licensee or applicant; or any contractor (including a supplier or consultant), subcontractor, employee of a contractor or subcontractor of any licensee or *1071 applicant for a license ...." 10 C.F.R. § 50.5(a).
11. TSI is a supplier of materials to NRC licensees.

D. The Thermo-Lag Investigation.

12. TSI's fire-retardant material, Thermo-Lag, is installed in nuclear power plants to protect at least one train of equipment and wiring necessary to shut down a plant in the event of a fire. See 10 C.F.R. § 50.48; General Design Criteria # 3, 10 C.F.R. Part 50, Apps. A and R. See generally NRC Opposition to Motion for Preliminary Injunction ("NRC Opp.") at p. 6 and Ex. 1.
13. The NRC places a high premium on product testing that is independent of control by the product's manufacturer. See NRC Opp. at pp. 6-7 and Ex. 4.
14. During the early 1980's, TSI submitted the results of Thermo-Lag tests to the NRC, stating that the tests had been conducted independent of TSI's control. See NRC Opp. at pp. 7-8.
15. During the period from 1982 through 1992, TSI's sales of Thermo-Lag to the nuclear industry totaled over $58 million. TSI still sells Thermo-Lag products to the nuclear industry. See NRC Opp. at p. 8 and Ex. 5.
16. In 1989 NRC licensee Gulf States Utilities informed the NRC of a possible fire test failure by Thermo-Lag products. NRC Opp. at p. 8. The NRC formed a Special Review Team in 1991 to investigate the installation and testing of Thermo-Lag. See NRC Opp. at p. 8 and Ex. 3. At the same time, the NRC's Office of Inspector General and its Office of Investigations jointly commenced an investigation of possible criminal misconduct in connection with Thermo-Lag testing. These parallel NRC civil and criminal investigations centered around whether TSI had, in a number of communications with NRC licensees and the NRC itself, overstated the nature and extent of the involvement of independent testing laboratories, particularly Industrial Testing Laboratories ("ITL"), in the testing of Thermo-Lag. Compl. ¶ 13; NRC Opp. at p. 8, 12.
17. There were several exchanges of correspondence between TSI and the NRC, and the NRC conducted an inspection of TSI's facilities. See NRC Opp. at pp. 8-10 and Ex. 6
18. The NRC staff later concluded that some of the communications from TSI contained false or misleading information. See generally NRC Opp. at pp. 20-22 and Exs. 1 and 2.
19. The Special Review Team contracted with two independent laboratories, the National Institute of Standards and Technology ("NIST") and the Sandia National Laboratories ("Sandia") to conduct independent tests of Thermo-Lag. See NRC Opp. at pp. 10-11 and Exs. 7 and 8.
20. The NIST and Sandia tests revealed significant failures of Thermo-Lag. See NRC Opp. at pp. 10-11.
21. The NRC paid a total amount of approximately $800,000.00 for the NIST and Sandia tests. See NRC Opp. at p. 13 and Exs. 7 and 8.
22. In addition, the NRC re-assigned numerous individuals from their normal duties to investigate the testing and installation of Thermo-Lag. See NRC Opp. at pp. 11-13 and Exs. 8, 9 and 10.
23. Based upon the NRC's investigation, including the NIST and Sandia tests, the NRC issued eighteen formal communications to NRC licensees regarding problems with the installation and use of Thermo-Lag. See NRC Opp. at p. 11 & n. 3. In April 1992 the NRC Special Review Team issued its final report on Thermo-Lag. NRC Opp. Ex. 3. The NRC stated the fire resistive value of Thermo-Lag was "indeterminate," but found "the relative safety significance of the [Thermo-Lag] fire barrier concerns to be low." Id.; NRC Opp. at p. 10. Thermo-Lag remains installed at numerous nuclear power plants across the country and the NRC has continued to approve its installation.

E. The Criminal Investigation And Trial.

24. In the fall of 1992 the NRC referred its investigation of TSI to the Department of Justice, which brought the matter before a federal grand jury in the District of Maryland. NRC Opp. at p. 13.
*1072 25. On September 29, 1994, the grand jury returned a seven count indictment against both TSI and its president, Rubin Feldman, for making false statements to the NRC concerning the independence of its Thermo-Lag testing program. NRC Opp. at p. 14; see Indictment, 9/29/94, United States v. Thermal Science, Inc., et al., No. DKC-94-0383.
26. The Indictment alleged as follows:
A. Count 1 charged that TSI and Mr. Feldman had conspired with ITL and others to impede and impair the NRC from performing its statutory duties, by making allegedly misleading statements about the nature of the Thermo-Lag tests and the respective levels of involvement of TSI and ITL in such tests;
B. Counts 2-4 charged TSI and Mr. Feldman with making the following false statements to the NRC in violation of 18 U.S.C. § 1001:
1. Count 2 alleged that on December 3, 1991, TSI and Mr. Feldman had submitted two test reports to the NRC which falsely represented they were "prepared" by ITL and were performed under ITL's "supervision and total control";
2. Count 3 asserted a claim that on November 12, 1991, TSI and Mr. Feldman submitted a different test report to the NRC which again falsely represented to have been "prepared by" ITL;
3. Count 4 alleged that during a transcribed meeting with the NRC on October 17, 1991, TSI and Mr. Feldman had falsely represented that ITL had "officiated during the phases of the testing," and had acted "as independent[ly] as you can make it"; and
C. Counts 5-7 alleged that the same acts and communications charged in Counts 2-4 also constituted "willful" violations of the NRC's Wrongdoer Rule, 10 C.F.R. § 50.5, and hence violated the AEA's criminal penalty provision, 42 U.S.C. § 2273.
See Indictment Counts 1-7; Compl. ¶ 15; NRC Opp. at pp. 14-15.
27. Following the filing of a motion to dismiss, the Government agreed to dismiss Counts 5-7 of the Indictment. Subsequently, on May 4, 1995, the grand jury returned a Superseding Indictment against TSI and Mr. Feldman, reasserting the same charges previously alleged in Counts 1-4, but rearranging them in chronological order. Compl. ¶¶ 15-16; Superseding Indictment at pp. 1-39; NRC Opp. at p. 14. This four-count indictment charged three counts of false statements under 18 U.S.C. § 1001 and 18 U.S.C. § 2 and one count of conspiracy under 18 U.S.C. § 371. NRC Opp. at p. 14 and Ex. 2.
28. In May 1995 the criminal trial against TSI and Mr. Feldman commenced in Greenbelt, Maryland.
29. On August 1, 1995, the jury for the criminal case returned a unanimous verdict acquitting TSI and Mr. Feldman of all charges. The District Court entered its judgment of acquittal in favor of both defendants that same day. Compl. ¶ 16; NRC Opp. at p. 16.

F. The NRC's Administrative Framework For Civil Penalties.

30. Under § 234 of the AEA, the NRC must providewritten notice to persons against whom it proposes to assess a monetary penalty, and provide them an opportunity to contest the penalty. See 42 U.S.C. § 2282(b).
31. An entity charged with a violation by the NRC may either pay the fine or answer the NOV, stating any relevant reason why the penalty should not be imposed. 10 C.F.R. § 2.205(b). If the charged entity files an answer to the NOV, the NRC staff will consider the answer and "issue an order dismissing the proceeding or imposing, mitigating, or remitting the civil penalty." 10 C.F.R. § 2.205(d). If the charged entity does not answer the NOV, the NRC staff may issue an order under 10 C.F.R. § 2.202 imposing the proposed civil penalty. Upon issuance of an order imposing a civil penalty, the charged entity may request an administrative hearing challenging the order. 10 C.F.R. § 2.205(d) and (e). This hearing would be held before an independent presiding officer (either an Administrative Law Judge or a three judge panel of the Atomic Safety and Licensing Board). 42 U.S.C. § 2241; 10 C.F.R. § 2.704(a). The decision *1073 from this hearing is appealable to the Nuclear Regulatory Commission, a five person body whose members are appointed by the President and confirmed by the Senate. 10 C.F.R. §§ 1.11(b) and 2.786(b)(1).
32. A final determination that a civil penalty should be imposed is not self-executing, even after the above described administrative process is completed. The NRC must request the Attorney General to institute a collection action to recover the civil penalty. 42 U.S.C. § 2282(c); 10 C.F.R. § 2.206(h). The entity charged with the violation is entitled to a trial de novo during the collection action. The Attorney General has "the exclusive power to compromise, mitigate, or remit such civil penalties as are referred to him for collection." 42 U.S.C. § 2282(c).

G. Issuance Of The "Proposed" Civil Penalty In This Case.

33. On October 1, 1996, the NRC issued a NOV to TSI for statements made to the NRC during the Special Review Team's investigation into the testing and installation of Thermo-Lag. See NRC Opp. at pp. 20-22 and Ex. 1.
34. The NOV charged TSI with making false statements to the agency concerning the independence of the Thermo-Lag tests and the relative roles played by TSI and various testing laboratories. Compl. ¶ 19; NRC Opp. at p. 20. According to the NOV, TSI's allegedly false statements violated the Wrongdoer Rule, 10 C.F.R. § 50.5, thus justifying the assessment of monetary penalties against TSI pursuant to the AEA's statutory civil penalty provision, 42 U.S.C. § 2282. See NOV at p. 1.
35. The NRC issued a proposed civil penalty of $900,000.00 against TSI on October 1, 1996. See NRC Opp. at Ex. 1. The NRC has not assessed any penalty against TSI but instead has only asked TSI to respond to the proposed civil penalty. The NRC explained that its penalty charges were based on "a review of the transcript of the criminal proceeding against TSI in the United States District Court for the District of Maryland ...." NOV at p. 1.
36. The NOV cited nine groups of statements made by TSI to the NRC Special Review Team and considered each group of statements to be a single violation of 10 C.F.R. § 50.5(a)(2), which prohibits nuclear industry suppliers from "deliberately" submitting information to the NRC known "to be incomplete or inaccurate in some respect material to the NRC." See NRC Opp. Ex. 1.
37. Two of the nine alleged violations listed in the NOV, and part of another, are the same as charges of which TSI was acquitted at the criminal trial. NRC Opp. at pp. 21, 49.
38. Six of the seventy-one "overt acts" identified in the Superseding Indictment are also "related to violations identified in" the NOV. Id. at p. 15 n. 6.
39. Five of the nine alleged violations listed in the NOV were not prosecuted at the criminal trial. Compare NRC Opp. Ex. 1, with NRC Opp. Ex. 2. The NRC contends that the remaining NOV charges are different than those alleged at the criminal trial, NRC Opp. at pp. 47-48, while TSI argues that the substance of the NOV allegations is the same as those of which it was previously acquitted. See Compl. ¶¶ 20-21.

H. This Lawsuit.

40. TSI has not yet exercised its right to contest the proposed penalty before the NRC. Accordingly, TSI has not presented any arguments directly to the NRC concerning the issues raised before this Court, and the NRC has not had a chance to apply its administrative decisionmaking process.
41. In November 1996, just prior to the deadline for responding to the NOV, TSI commenced the present action for injunctive relief against the NRC.
42. The NRC's penalty proceeding has been held in abeyance since this action was filed, pursuant to a Scheduling Order entered by the Court at the parties' joint request. The Scheduling Order provides that TSI will not be required to file its administrative response to the NOV "until fourteen (14) days after the Court's decision" on TSI's request for preliminary injunctive relief. Scheduling Order 11/26/96 ¶ 8.

*1074 CONCLUSIONS OF LAW

I. Jurisdiction and Venue.

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e), because the NRC is an agency of the United States and plaintiff TSI resides in this District.

II. The NRC's Allegation of Prematurity.

The NRC alleges this lawsuit is premature because it does not challenge an agency action that is final as required by the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. TSI does not claim that the NRC has taken any final action or that the APA is inapplicable to this case.
The relevant statutory provision governing review of final NRC actions is the Hobbs Act, which provides the federal circuit courts of appeal with exclusive jurisdiction. 28 U.S.C. § 2342(4). The relevant portion of the Hobbs Act states, "The court of appeals ... has exclusive jurisdiction to enjoin, set aside, suspend, (in whole or in part), or to determine the validity of ... (4) all final orders of [the NRC] made reviewable by section 2239 of title 42 ...." 28 U.S.C. § 2342.[1] 42 U.S.C. § 2239 refers to "the activities of licensees."
The parties disagree as to whether TSI is challenging the Wrongdoer Rule outright, or simply disputing the NRC's authority to issue the proposed penalty against it because TSI is not a licensee. In response to the NRC's assertion that this action is improperly before this Court, TSI states it is not required to proceed through the Hobbs Act, because it is a non-licensee and even if it was challenging the Wrongdoer Rule, the place to do so is in this Court.
This Court need not decide whether TSI is directly challenging the Wrongdoer Rule or whether such a challenge could properly be brought in this Court instead of initially being filed with the Eighth Circuit Court of Appeals.[2] Federal courts are courts of limited jurisdiction. Absent a statute specifically conferring jurisdiction, district courts lack power to consider claims. This limitation is particularly important when a suit is brought against the federal government which, unless there is a waiver, is immune from suit via the doctrine of sovereign immunity. Kansas v. United States, 204 U.S. 331, 341, 27 S.Ct. 388, 51 L.Ed. 510 (1907).
As previously stated the Hobbs Act, 28 U.S.C. § 2342(4), provides a waiver of sovereign immunity by which final decisions of the NRC may be addressed before the court of appeals. Because TSI claims it need not and does not proceed under the Hobbs Act, it must proceed within the framework of the APA. See 5 U.S.C. § 702. The APA states, "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. Thus, both the APA and the Hobbs Act limit judicial review to final agency decisions. 5 U.S .C. § 704; 28 U.S.C. § 2342(4). TSI does not meet either statute's requirement of finality.

A. Finality.

The doctrine of finality requires that the initial decisionmaker arrive at a definitive position on an issue and that "an actual, concrete injury" be inflicted. Darby v. Cisneros, 509 U.S. 137, 144, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993)(quoting Williamson County Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 193, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). Thus, a potential plaintiff must normally wait until an agency has resolved its inquiry and challenge only a final agency decision. FTC v. Standard *1075 Oil Co., 449 U.S. 232, 244-45, 101 S.Ct. 488, 66 L.Ed.2d 416 (1980). The initiation of an investigation by an agency does not constitute final agency action. Standard Oil, 449 U.S. at 239-45, 101 S.Ct. 488 (holding that the mere issuance of an administrative complaint was not final agency action). The Court notes that an exception exists where agency action is plainly against a statutory mandate, such as attempting to exercise power specifically withheld by statute. Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L.Ed.2d 210 (1958)[3]; NLRB v. Van Gorp Corp., 615 F.2d 759, 760 (8th Cir.1980). In the instant case, although TSI's statements regarding the Wrongdoer Rule may be construed as an allegation that the NRC acted outside its statutory scope, it cannot be said that there is a clear contravention of a statutory mandate, and Leedom is therefore inapplicable. Accordingly, the Court concludes that this suit is premature under the doctrine of finality.

B. Exhaustion of Remedies.

The NRC makes a separate argument that TSI's failure to exercise, much less exhaust, the administrative remedies available to it makes this lawsuit premature. TSI responds that its claims are timely and properly raised before the Court because its double jeopardy claim is constitutional and need not be administratively pursued, and the NRC has no technical expertise which needs to be applied in this case.
The exhaustion of administrative remedies doctrine serves the purpose of "promoting judicial efficiency." McCarthy v. Madigan, 503 U.S. 140, 145, 112 S.Ct. 1081, 117 L.Ed.2d 291 (1992).[4] Administrative agencies should have the opportunity to "correct [their] own alleged errors in the first instance, ...." United States v. Dico, 136 F.3d 572, 576 (8th Cir.1998). Requiring exhaustion of administrative remedies also discourages the "frequent and deliberate flouting of the administrative processes." McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). "[W]here Congress has not clearly required exhaustion, sound judicial discretion governs." McCarthy, 503 U .S. at 144, 112 S.Ct. 1081 (emphasis added).
There is no statute requiring that a party exhaust NRC administrative remedies before resorting to judicial review. The exhaustion requirement may be waived in cases in which it is judicially imposed instead of statutorily. Dico, 136 F.3d at 576. This Court must therefore apply its discretion to determine whether TSI is required to exhaust its administrative remedies before obtaining judicial review of its claims.
"In determining whether exhaustion is required, federal courts must balance the interest of the individual in obtaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." McCarthy, 503 U.S. at 146, 112 S.Ct. 1081. See United States v. Newmann, 478 F.2d 829, 831 (8th Cir.1973)(adopting the same test for the Eighth Circuit). The Supreme Court has recognized three general circumstances in which an individual's interests weigh heavily against requiring administrative exhaustion. McCarthy, 503 U.S. at 146, 112 S.Ct. 1081. Those circumstances occur when 1) prejudice to a later filed lawsuit may result, 2) there is doubt as to whether the agency has the power to grant effective relief, or 3) there is evidence that the administrative body has already reached a decision or is biased. Id. at 146-49, 112 S.Ct. 1081.
The first circumstance may occur when there is an indefinite or unreasonable time-frame for the agency to take action. Id. at 146-47, 112 S.Ct. 1081. In the instant case, TSI does not assert that the NRC has delayed in its proceedings, intends to do so, or that the NRC's time frame for acting and reaching a final decision is unreasonable.
In analyzing the first circumstance, the Court must be cognizant of the fact that even *1076 if the agency's decision making schedule is reasonable, a "plaintiff may [in certain situations] suffer irreparable harm if unable to secure immediate judicial consideration of his claim." McCarthy, 503 U.S. at 147, 112 S.Ct. 1081. TSI does not advance such an argument in direct opposition to the NRC's claim that this case is premature. TSI does, however, contend that a preliminary injunction is necessary because it will suffer irreparable harm in the absence of injunctive relief preventing the NRC from imposing a civil penalty.
In support of its motion for a preliminary injunction, TSI states its irreparable injuries include damage to TSI's reputation; harm to its goodwill; loss of consortium; significant reduction of revenues, profits, and workforce; and the substantial expenses associated with having to defend against the NRC's penalty action. Compl. ¶¶ 30, 34. TSI claims that during the criminal trial its business and profits declined, with revenues falling a total of 60%. TSI states the current penalty proceeding exacerbates the harm done to its business and reputation during the criminal trial. TSI further contends that if the $900,000.00 proposed penalty was actually imposed, it would immediately be deprived of 40% of its net worth. Finally, TSI claims it will suffer unrecoverable economic loss, because it is possible that the NRC may assert a sovereign immunity defense against any subsequent damage claim by TSI. The NRC disputes that any damages suffered by TSI would be irreparable.
TSI relies on Baker Elec. Coop., Inc. v. Chaske, 28 F.3d 1466, 1473 (8th Cir.1994), to support its claim of irreparable harm. In Baker, the Eighth Circuit held that the "threat of unrecoverable economic loss does qualify as irreparable harm." 28 F.3d at 1473. Accord Iowa Utilities Bd. v. F.C.C., 109 F.3d 418, 426 (8th Cir.1996). These cases, however, are distinguishable from the instant case.
Iowa Utilities is factually distinguishable because special circumstances existed in that case which led the Court to find irreparable harm. The Court's finding was specifically based on the fact that the petitioner's economic losses could not be recovered merely through participation in the market. Iowa Utilities, 109 F.3d at 426. Conversely, there is no indication that TSI could not win back any lost customers through rigorous competition and regain its good name by continuing to implement sound business practices.
More importantly, these cases are distinguishable from the instant case because both Iowa Utilities and Baker discussed irreparable harm as one of the four factors in the context of a preliminary injunction ruling, not as a factor in determining whether to circumvent the exhaustion of administrative remedies doctrine. More on point is Clinton County Comm'rs v. United States Environmental Protection Agency, 116 F.3d 1018, 1024 (3rd Cir.1997), in which the plaintiffs sought to circumvent the administrative process via judicial review of an Environmental Protection Agency (EPA) remedial action before completion of the action.[5] Plaintiffs claimed that the statutory preclusion of judicial review until an EPA remedial action becomes final, 42 U.S.C. § 9613, should be circumvented because there was a "considerable showing of irreparable harm and illegality", and the defendant had no legitimate interest in protecting the challenged conduct from judicial review. Id. at 1025.
The Third Circuit found that plaintiffs' argument was inconsistent with established principles of sovereign immunity. The Court explained that Congress intended concerns regarding EPA remedies to be communicated directly to the EPA, not expressed to a court in the first instance. Clinton County, 116 F.3d at 1024. In light of the well-recognized doctrine of sovereign immunity, the Court held the plaintiffs were not entitled to be excused from the jurisdictional requirements of 42 U.S.C. § 9613. Id.
Although the Third Circuit was not addressing an APA case in Clinton County, the general principles expressed in the decision are applicable. The Court finds nothing in Eighth Circuit precedent that calls Clinton County's holding into doubt and will therefore adopt its reasoning. In the instant case, *1077 Congress dictated that the NRC provide anyone facing a proposed monetary penalty an opportunity to contest that penalty. 42 U.S.C. § 2282(b). In response to that statutory mandate, the NRC established a detailed administrative framework within which an entity charged with an NRC violation can challenge NRC actions. See discussion of agency procedure supra pp. 1072-73. If a party subject to a proposed civil fine was allowed to circumvent the exhaustion and finality doctrines by seeking judicial review prior to a final agency decision, the NRC's autonomy could be compromised and judicial efficiency would be ill served. This is so even where irreparable harm is a factor.
TSI alleges that because of the nature of the issues it raises in this suit, there is no possible benefit from giving the NRC time to apply its expertise. The Court disagrees. "Because of the agency's expertise in administering its own regulations, the agency ordinarily should be given the opportunity to review application of those regulations ...." Bowen v. City of New York, 476 U.S. 467, 485, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).
The second circumstance in which an individual's interest weighs against requiring exhaustion of administrative options is when a doubt has been raised regarding the agency's ability to grant effective relief. McCarthy, 503 U.S. at 147-48, 112 S.Ct. 1081. An agency may, for instance, lack the knowledge to properly consider whether a given statute is constitutional. Id. at 148, 112 S.Ct. 1081. In the instant case, TSI does not claim that a statute is unconstitutional. TSI's complaint does, however, raise the constitutional issue of double jeopardy.
Courts differ as to whether exhaustion of administrative remedies is required when a complaint raises a constitutional issue.[6] The Eighth Circuit has stated, "Requiring exhaustion of administrative remedies where constitutional issues are raised is also consistent with the goal of efficiency. Agency action favorable to the claimant may eliminate the need for the courts to pass on the constitutional questions." Darr v. Carter, 640 F.2d 163, 165 (8th Cir.1981). Therefore, the fact that TSI raises the issue of double jeopardy does not warrant an exception to the exhaustion of administrative remedies doctrine.
The final circumstance where the exhaustion requirement may be waived is when an administrative remedy may be inadequate because the administrative body is shown to be biased or has otherwise predetermined the issue before it. McCarthy, 503 U.S. at 148, 112 S.Ct. 1081. Here, TSI has not alleged or presented evidence that the NRC is in any way biased.
Although the Court determines none of the three McCarthy circumstances warranting waiver of the exhaustion requirement are present in the instant case, the analysis does not stop there. The Court must weigh the government's interests in administrative autonomy against the individual's interests in immediate judicial review. West v. Bergland, 611 F.2d 710, 715 (8th Cir.1979), cert. denied, 449 U.S. 821, 101 S.Ct. 79, 66 L.Ed.2d 23 (1980). The Court will first consider the NRC's interests in requiring TSI to exhaust its administrative remedies. Allowing an agency to "perform functions within its special competence" is a primary governmental interest. Parisi v. Davidson, 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972).
Functions within an agency's "special competence" include addressing disagreements over the meaning of agency regulations. West, 611 F.2d at 715. If TSI is directly challenging the NRC's Wrongdoer Rule, addressing that issue is a function within the agency's special competence. TSI's complaint asserts that the NRC lacks statutory authority to impose monetary penalties on "suppliers such as TSI" for violation of [the Wrongdoer Rule] .... Compl. ¶ 33A. The complaint also alleges that the NRC "exceeded its statutory authority by attempting to apply [the Wrongdoer Rule] to TSI ...." Compl. ¶ 33B. Because the NRC is an expert *1078 in administering its own regulations, it should be given the opportunity to determine whether the Wrongdoer Rule is properly applied to TSI. Bowen, 476 U.S. at 485, 106 S.Ct. 2022.
A second governmental interest in enforcing the exhaustion doctrine is to discourage the "frequent and deliberate flouting of the administrative process." McKart, 395 U.S. at 193, 89 S.Ct. 1657. This interest is particularly significant here because a determination that this case is properly before the Court would encourage entities in TSI's position to seek judicial review, interrupting the agency's program of enforcement.
A third interest to consider is that the NRC should be allowed the first opportunity to "apply the law it was designed to administer." West, 611 F.2d at 716. As the Supreme Court has explained:
The agency, like a trial court, is created for the purpose of applying a statute in the first instance.... it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages.
McKart, 395 U.S. at 193-94, 89 S.Ct. 1657. Allowing the NRC to perform its "trial court" function would serve the interest of administrative autonomy. West, 611 F.2d at 716. A fourth interest in administrative autonomy is that of allowing agencies to correct their own errors, which may moot any controversy and negate the need for judicial review. Id.
The Court now turns to TSI's concerns with securing immediate judicial review. To warrant judicial interference with an agency's administrative process that is not clearly outside its statutory authority, there must be a showing of an "exceptional circumstance." West, 611 F.2d at 718; Newmann, 478 F.2d at 831. Courts traditionally require a cogent showing that denial of immediate judicial review will subject a party either to irreparable injury or an inadequate remedy. West, 611 F.2d at 719.
As previously discussed, TSI has not made a cogent showing of irreparable harm. Further, TSI is well aware of the process for challenging NRC action and decisions, and may challenge the agency's statutory authority before the agency itself. See generally California v. FTC, 549 F.2d 1321, 1324 (9th Cir.1977)(stating that an agency should initially determine its own jurisdiction). TSI may then seek judicial review of a final NRC decision. Therefore, TSI has an adequate remedy.

Conclusion.
In accordance with the foregoing discussion, the Court finds the NRC's interest in administrative autonomy outweighs any need TSI may have for obtaining immediate judicial review of the NRC's actions. There is no reason to permit a lawsuit challenging a proposed civil penalty where the NRC's administrative proceeding may result in rescission or reduction of the proposed penalty. TSI's motion for a preliminary injunction is therefore premature and the NRC's motion to dismiss should be granted. As a result, the Court does not address TSI's arguements concerning double jeopardy and whether the NRC is authorized to impose penalties on a non-licensee. Pursuant to the Scheduling Order issued by this Court on November 26, 1996, TSI has fourteen days from the date of this order in which to file its administrative response to the NOV.
Accordingly,
IT IS HEREBY ORDERED that Thermal Science, Inc.'s Renewed Motion for a Preliminary Injunction is DENIED as premature. [Doc. 40]
IT IS FURTHER ORDERED that the Nuclear Regulatory Commission's Motion to Dismiss is GRANTED. [Doc. 38]
An appropriate order of dismissal will accompany this order.
NOTES
[1] 28 U.S.C. § 2342(4) refers specifically to final orders of the Atomic Energy Commission ("AEC") which has been abolished and its functions in large part turned over to the NRC. See 42 U.S.C. §§ 5814, 5841(f). Final orders entered by the NRC in the performance of functions transferred from the AEC are reviewable as if they had been entered by the AEC. 42 U.S.C. § 5871(g).
[2] While not reaching this issue, the Court draws plaintiff's attention to General Atomics v. United States Nuclear Regulatory Comm'n, 75 F.3d 536 (9th Cir.1996)(holding the Hobbs Act is to be read broadly, encompassing all final NRC decisions preliminary or incidental to licensing, including whether parent company of a licensee could also be considered a licensee, making it responsible for cleanup costs pursuant to an NRC order).
[3] In Leedom, the National Labor Relations Board acted in direct defiance of a statutory prohibition when it placed professionals with non-professionals in the same voting group without obtaining a vote of the professionals. Leedom, 358 U.S. at 184.
[4] Although McCarthy was not an APA case, the general principles stated therein are applicable in general to the exhaustion doctrine and APA cases. See generally Darby v. Cisneros, 509 U.S. 137, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993).
[5] Plaintiffs were attacking an incineration remedy which they claimed would violate numerous federal laws by releasing toxic substances into the air and causing irreparable harm to the environment and nearby residents.
[6] When the constitutional issue raised deals with fairness of the administrative proceedings, the Seventh Circuit requires exhaustion. International College of Surgeons v. City of Chicago, IL, 91 F.3d 981, 992 (7th Cir.1996). The D.C. Circuit holds that exhaustion is not required in the face of a First Amendment challenge to regulations. Weaver v. United States Info. Agency, 87 F.3d 1429, 1434 (D.C.Cir.1996).